Good morning. May it please the court. Again, my name is Nicholas Stern and I represent James Goldstene, Executive Officer of the California Air Resources Board. I'd like to make two points today. I'd like to show how the District Court erred by finding that the VESTA rules are preempted emission standards rather than valid in-use regulations. Secondly, I'd like to show how the Submerged Lands Act does not preclude California's from regulating emissions from more than three miles. The VESTA rules could have been drafted as pure fuel switching requirements. They would have been very easy to analyze if they had done that. Applying the Supreme Court's test in EMA v. South Coast, such a pure fuel switching regulation would clearly not have been set a maximum definite limit. Such a fuel regulation would not have required any addition of an additional emission control device. Such a regulation would not require any other design feature related to the control of emissions. That's not what they did. What they did was they added flexibility for the sake of VESTA operators so that they could comply by alternative means of compliance. Well, what they did was they didn't say you have to use this kind of fuel. What they said is you can't emit X amount of level. That is effectively the same thing. The emission, those limits that you're referring to only come into play if the vessel operator intends to use one of the alternative means of compliance. So would you consider that without the provision for alternative switching to cleaner diesel fuel from bunker oil or whatever it is that they're using in these engines, that if we just had before us the measurement, which essentially as I understand it is determined by the measuring the particulate matter that comes out of the engine, that that would be an emission regulation standing alone, would it not? If what you're saying, Judge Tallman, is that if you eliminate subsection C of the regulation, the presumption, I would have to answer no. Because by using, once again, it still would be true that by using the compliant fuel, the operator is necessarily in compliance. Let's suppose that the Air Resources Board had done nothing more than promulgate a regulation saying, we think that marine diesel engines are creating too much air pollution in and about the coast of California. And we hereby promulgate these regulations that say that these engines shall not emit particulate matter beyond these levels. Those would be pure emission standards, would they not? I do admit that that would be a closer call. The problem there is that under the EMA versus South Coast test, it requires an emission standard is one that is a definite, certain, fixed number. If I read this, I'm looking at marine vessel rules and it's kind of truncated. They can't exceed the emission rates if you use specified fuels and then with a specific sulfur content. That is basically a descriptive way of giving an emission level, is it not? Isn't it an emission standard? Judge McEwen, again, those emission levels only come into play, though, if they don't comply by switching fuels. Okay, but let's go back. So just the language I read in terms of how it's defined, the emission rates and then subject to fuel and the specific sulfur content. Standing alone, is that an emission standard? It is not an emission standard because any engine can comply regardless of its emission characteristics. If an engine is using the compliant fuel, it doesn't matter what the level of emissions are. Yeah, the problem is that you're now switching. You're switching back to the alternative. And the only way you have of determining whether or not the switch to the alternative fuel is acceptable is through an emission standard. Because that's the only test you have in order to know whether or not you can improve the emissions from the engine and reduce pollution. If I may, Judge Tolman, I could compare it to EPA regulations that they have approved as in-use regulations that have similar characteristics. So your position is this is no different from forcing us to buy biodiesel fuel at the pump for our car? That's right. Although this is, since it's a non-road source, different conditions. Yeah. Now, I do think that where the key, I think the key to the points that Judges McKeown and Judge Tolman are making is the answers in Ray. Because Ray says that even if there is, if there is an alternative that is permitted, that saves an otherwise preempted regulation. But the problem in Ray was that we're trying to get around the double hull requirement. And the way that you do it is you hire an escort tug. And then you can bring your single hull tanker and fuse it sound. Because if things go awry, you have a tugboat that can prevent the tanker from going on the rocks. Exactly. But since you've now taken us geographically to the Pacific Northwest, let me ask you a geographical question. California wants to regulate vessels 24 miles out into the waters of the Pacific. I live in a state where we have vessels that transit Puget Sound that may be bound for ports in Vancouver, British Columbia. They may be bound for the ports of Tacoma or the ports of Seattle. On the southern edge of Washington, I've got vessels coming up and down the Columbia River that may be going to Oregon ports of call, or they may be going to Washington ports of call. If we rule in your favor, what's to prevent the legislatures of Oregon and Washington, or British Columbia for that matter, from promulgating regulations that are different and which may require both domestic and foreign flight vessels that call on all these ports, including California ports, from having to comply with multiple regulations that may specify different levels or in-use regulations that are going to be inconsistent? Isn't that the whole purpose behind federal preemption in order to promote uniformity, particularly in a traditional area, maritime commerce, going back to the founding days of the Republic, which has always been within the purview of the federal government? Well, Judge Coleman, you've got me thinking about two different things. First of all, getting to the second one, while maritime commerce is, a traditional federal area, what we're dealing with is a claim of Clean Air Act preemption. And air pollution is an area of traditional historic state concern. So I don't think it's, I think, for instance, in the recent case of UFO shooting, that case would have been preempted because it was a regulation of maritime interest. And what saved it? What saved it was that, well, first of all, the presumption against preemption applied. And Congress passed a specific provision in the Budget Reconciliation Act, which gave Hawaii the authority to intrude into an otherwise historical federal maritime area in order to preserve humpback whale mating grounds. The Congress's legislation in that case, though, did not address regulation of licenses, Coast Guard licenses. Well, the argument was that by virtue of the fact that the Coast Guard had regulated licensing, that these whale restrictions, if I could call them that, on the operation of vessels off the coast of Maui, was somehow impinging upon traditional maritime authority. And the answer to that question is, even if it did, Congress has said, that's okay. The problem you've got here is that California didn't get the permission of the administrator of the Environmental Protection Agency before it began enforcing these regulations. Well, Judge Solomon, a couple of notes there. First of all, Congress did allow states to adopt in-use regulations. And I think the interpretation that PMSA is asserting would actually wipe out Section 209D's application here. Let's go back, though. You started with in-use, and we're kind of getting back to this. What is your position as to whether what we're talking about is actually a fuel requirement? Is it or is it not a fuel requirement? Certainly it's a flexible fuel requirement. Like a lot of regulations, it requires one thing, but it allows optional methods to comply. But if I looked at your materials prior to the brief, it seems to me that you say there that the regulations don't even require homeowners to use certain fuels. It's not a fuel requirement or a switching requirement, at least in the materials as you described them leading up to these regulations. But now in the brief, you're saying it's a fuel requirement. Forgive me, Your Honor, but in the administrative materials that CARB submitted, it says throughout those materials that this is a fuel requirement, but that there are many options. It's flexible. If I understand correctly, these rules apply not just to vessels that are docked at a port in California, but in addition to vessels that are 24 miles out into the ocean. Is that right? That's right. By what right does California regulate those waters up there? Well, the PMSA argues that they're precluded from doing that by field preemption of the Submerged Lands Act. But the Submerged Lands Act has nothing to do with that. The cases of Barber, Gillis, and Warner v. Dunlop all rejected claims of field preemption based on the Submerged Lands Act. So that's why instead CARB suggests that the court look to the effects test, which is a test that has been applied for at least almost 100 years, beginning with Strassheim v. Daly by the Supreme Court. And it sets forth that states can adopt reasonable regulations of extraterritorial conduct. So can you help me again with my Pacific Northwest geographical example? Aren't the states of Oregon, Washington, and the province of British Columbia going to have exactly the same concerns? Thank you for bringing me back to that. Actually, I think that if Congress had wanted uniformity in the area of fuel regulations, it would have, when it amended the Clean Air Act in 1990, it would have amended Section 211 as well. The 211 is the regulation, I mean, the statute about fuels. It could very easily have added a preemption of fuel regulations to that. It chose not to. Therefore, there's no indication that Congress, unlike when it comes to manufacturing, there's no indication that Congress has an interest in preserving the uniformity of fuel regulations. But if we disagree with your characterization that these are in-use fuel regulations, and decide instead that what they really are are emission levels, then we do have a uniformity problem, do we not? Because then if we allow California to do it, there's nothing to prevent Oregon, Washington, and the province of British Columbia from doing the same thing but picking different emission level standards than what California has done. Again, I think you cannot assume that Congress intended uniformity. The Supreme Court in Askew, for instance, said that federal amnesty law does not swallow the state's police power. The court in Ray said that vessels need to comply with reasonable environmental protection measures. But your argument taken to this logical conclusion has to be that those legislatures have the same authority that California does under the effects test to issue these kinds of regulations. Absolutely, they could. I'm saying that Congress didn't see a problem with that. This is not an area where Congress demanded uniformity. As long as it's in-use or an approved circumstance, right? Yes. Okay, so if you get to in-use, here's where I'm having some trouble. Maybe you can help me out. When you look at the statute and you think about the Ray case, you know, for example, the tugboat pulling, you know, piloting the ship into Puget Sound or whatever, that's one that seems to me you could say, well, that relates to the operation of the vessel within the waters of the state of Washington. Cities that impose, you know, no driving days or carpool lanes and things like that, those are the typical in-use provisions that are usually exemplary. How does this regulation fit into the in-use statutory definition? Judge McCune, for one thing, the EMA versus CPA case cited legislative history where the, I think they were the congressional managers, said, as an example, that sulfur limits on fuel are a type of in-use regulation. That's a sulfur limit on fuel. This is an emission standard. Isn't that a fuel requirement in effect? Single fuel requirement? Yes, this is a fuel requirement. A sulfur limit on a specific fuel. Yes, my position, CARB's position is this is essentially, it's a fuel requirement that allows options, that allows flexibility so that vessel operators can comply in other ways. For example, if you said you have to use fuel X, is that an in-use requirement? Yes. Because while it might, by the back door, be an emission requirement, because it obviously maybe has a certain characteristic, but it's a fuel requirement, correct? Yes. It's not an emission standard. That's correct. And you would like to have us treat this regulation as following exactly that kind of a fuel requirement situation, correct? Exactly, Your Honor. The EPA approved, if I may speak to Texas's lawn regulations. There, Texas had adopted a traditional in-use regulation, hours of use restrictions for landscaping equipment. However, in Texas's rule, they allowed landscapers to submit alternative plans to achieve the same level of emission reductions so that they could continue to landscape during the morning hours. The EPA held that that was still, or not held, ruled that that was still a valid in-use regulation. But you didn't have, I guess the problem I had there is that the alternatives really weren't the issue because there was no preemption to begin with. And we're looking here to see whether there's preemption, so it's not exactly a parallel situation as I saw it. Effect, Judge McEwen, effectively it is, though. Effectively, what you're starting with is a fuel regulation. And then, just like in the Texas case, you are adding these alternatives. Why don't you answer Judge McEwen's question, then we're going to turn it over to Ms. Baird. But if there's a preemption, then the analysis would be different, correct? Yes. Thank you. Thank you. Thank you. Good morning. Good morning, Your Honors. May it please the Court, I'm Barbara Baird, representing today the South Coast Air Quality Management District, Natural Resources Defense Council, and Coalition for Clean Air. I'd like to remind the Court that the District Court actually agreed that fuel sulfur requirements are not preempted. That being the case, under the precedent that the U.S. Supreme Court set forth in Ray v. Atlantic Richfield, this Court should hold that the vessel rules as a whole are not preempted. In fact, the plaintiffs essentially concede in their discussion of Ray that if the rule had been written, use cleaner fuel or meet an alternative method of equivalent emissions, that under Ray this Court would be compelled to uphold the rule. And in fact, that's essentially what the rule does. It has no benchmark within it other than the use of clean fuels. But the benchmark has to be the emission standard, because otherwise we can't know whether or not the alternative fuel is cleaner or not. No, because we know that the standard set for the fuel is 5,000 parts per million. Any vessel, regardless of how dirty the engine may be, if it uses the fuel that has 5,000 parts per million, it complies. Even though the ultimate emission level may be higher than 5,000 parts per million? Well, it won't be higher than 5,000 parts per million in the fuel, but the number of particles emitted into the air may be very different. That's correct. And that's an essential distinction that EPA has stated between an in-use limitation and an emission standard. The emission standard can be met only by modifying the equipment. An in-use limitation or a sulfur requirement is met by changing how the equipment is used, i.e. the use of different fuel within that equipment. I'd like to address the question of the different states and whether they would adopt different standards. First, the court in the district court is falling into the trap of engrafting onto the Clean Air Act a Commerce Clause argument, but making it more difficult for us to regulate than under a Commerce Clause argument. In the Huron-Portland cement case decided by the U.S. Supreme Court upholding the applicability of air pollution regulations in Detroit, the court said that in the absence of any conflicting statutes or state requirements in the record, it would not entertain a Commerce Clause claim based upon conflicts. And in this record, in fact, not only is there no indication of conflict, in our record there is a PMSA website which indicates that in Tacoma, Seattle, Puget Sound area, there is, in fact, voluntary compliance by up to 50% of your vessels with low sulfur fuel, albeit there are no requirements in that area. So the specter of a patchwork... But it's not because of the fact that PMSA ships are calling at ports all over the North American continent, indeed all over the world for that matter. So if you're going to have a vessel that's operating, if it's got to comply with California's regulations, then it's probably going to be burning the same fuel whether it's calling at Long Beach and then moving on to Seattle and then on to Vancouver, British Columbia. Doesn't make any difference to a container ship, right? Well, it doesn't have to because it actually contains generally two fuel tanks, one for the dirtier bunker fuel, which it uses on the path over from Asia, and one for the cleaner fuel, which it uses as an approach... So they can switch back and forth is what you're saying? They can switch, yes. And finally, I would like to reiterate that Section 211 of the Clean Air Act is where the court established preemptions for states adopting fuel regulations. In that section, there is no preemption for fuel regulations for non-road engines. And, in fact, we have, as cited in Harb's brief, EPA stating that fuel switching near ports is a viable strategy for state governments, just as we've done here. I'd be happy to answer any questions of the court. I guess not, Ms. Baird. Thank you very much. Thank you. Why don't you hang on a second while we get the people out of the cheap seats here? Arden, is the clock working at all? How much time does counsel have on the clock? I have 20 minutes, Your Honor. The hour clock is malfunctioning here. That's why I'm asking. So I'm trying to keep time. Good morning, and may it please the court. My name is Eric Wise, a friend of Elitch & Wise, representing Pacific Merchant Shipping Association, their penalty in this case. I want to start by reiterating that within its territorial boundaries, there is no dispute in this case that California can adopt and enforce the standards set by Section E1 of the regulations, but must the only point of this case on the Clean Air Act issue is, do they have to go to the EPA to do so? And that's our point. Do you agree with Mr. Stern that if they had just worded this a little differently, we wouldn't have this problem? I think, Your Honor, I think if they had said that you must use low sulfur fuel, then the issue would be the one that was not reached or really addressed by the facts below. That is, does it require, would it require modification of the ship's engines? And in this case, at least the preliminary evidence below is that at least for some of the ships, it does require modification of the tanks and piping in order that the ship can have two tanks. And under the definition of... Well, that's just a question of fuel supply. No, Your Honor. It's because of the fact that contrary or differently than motor vehicle definition of the engine, a non-road engine is defined to include the fuel system on the ships. So that is a definition of non-road engine that would encompass the modifications. Otherwise the engine can handle the low sulfur fuel and switch from the more polluted bunker oil to the cleaner low sulfur fuel other than piping the modification. I think we conceded that below. So leaving aside any specter of ship modification, if Congress had in mind that one of the ways of having a fuel requirement would be to have a specific sulfur requirement, and if as State has argued that what you have here really is precisely that, a fuel requirement with a specific sulfur content, why then isn't that a fuel requirement that meets the end-use rules under Section D? Well, because of the way that they framed the regulation, Your Honor, and that is that they framed it as a standard, as an emission standard. That is not an exceedance, an emissions level for each of the specific pollutants. I think that's an important element here, which is that the NOx, SOx, and particulate matter are specified as pollutants. That's that chart that we keep seeing? Yes, Your Honor. But I think that in the case law, and I'm thinking particularly of the MA case, 627F2nd, the ADAMO case, the EMA versus EPA case, and of course, EMA versus South Coast AQOD, the point is that if you set an emissions level that the engine must meet, and it relates to specific pollutants, as does this regulation identify specific pollutants as those which are subject to the limitation, that is a standard within the meaning of all the 209 provisions. And that's really the point here, which is that they did not adopt a 2U standard, and they adopted a emissions standard, which is preempted by Section 209E2A of the statute. What is your response to their argument on Ray, that when you're looking at alternatives, that in effect, Ray would save them from any other infirmity that might be ignored in their wording of this particular regulation? Well, I think, first of all, alternatives really have nothing to do with our argument. But more importantly, I think they misread Ray. In Ray, what you had was you had a design requirement, which the court said, standing alone, was invalid. The state could not enforce that regulation, and that's what the case held. It went on to say that the alternative, which was the tug escort, was enforceable, and merely because they could also comply with that requirement by having voluntarily meeting the design requirements, that did not invalidate the valid tug and escort rule. But the point of Ray was that they invalidated the design requirements, which the analysis by the state and by the interveners does not face up to. And here, by analogy, section section E1, which is the emissions level provision, must be invalidated on its face because it's a on its face. It sets an emission standard in that. In this case, however, unlike the Ray case, if section E1 is in fact invalidated and it cannot be enforced, there is no alternative requirement. In other words, the section E1C is merely a presumption that there is a that is a that there is a that there is a compliance with E1. And because of that, if the court, as it should, were to invalidate E1, the standard of E1 as preempted, there is no alternative which would otherwise be satisfactory. Go back to what you started with. You said alternatives don't really have anything to do with our argument. And as I hear them, alternatives have everything to do with their argument. So where's the intersection? The intersection is, Your Honor, that the that the that the alternatives are set forth in G. Each one of those alternatives, however, must satisfy the standard of E1. That's unlike the tug and escort provision in in Ray. Where they're kind of independent. Where they were independent. Yes. And so if you if if one is invalid as an emissions level standard, then the then there is nothing left for as an alternative which can be enforced. And this was this is the way the rule is drafted. We didn't draft this rule. It was drafted by carbon. And for whatever reason, I suspect that the principal reason for the drafting of this was not flexibility, because they could have had a fuel use standard, which also which also had flexibility, which also had the alternatives of G, but was still a few years as pure fuel use standard. They didn't do that. I think the reason that they didn't do that was because underlying law is a fundamental point, which is that states cannot regulate shipping, the shipping industry, the internal workings on the ship. And they were concerned about that. So what they did was they set a performance standard, which now they come to the which they had we challenged this as as a as a as a as a rule, which regulated the internal workings of the ship. They would have said, no, it's a standard missions level that can be met by any any measure whatsoever. So that what they did was they drafted this rule to set an emissions level standard, but didn't go to the EPA. And that's all we're asking for. Go to the EPA. Make it a national standard so that we don't have to. Of course, they don't have to go. They don't have to go. Well, that's true. That takes me to all way taxi. Yes. Taxi City of New York says taxis have to use certain kinds of fuels and they have to have emission devices that regulate the amount of emissions. That was upheld by the Second Circuit. Right. How is our case different? Well, first of all, it was a motor vehicle case. And so that our case involves you. Besides the fact that when the taxi was a boat. Right. Right. No, but I think I think the point is one was a motor vehicle which is governed by two nine B and the other in this case is two nine E, which is I think it's been conceded at this point is does apply to used engines so that the that the that the point of all the way taxi for this case, which is that the that they apply to used engines, which is that you look to the issue of whether or not it has a effect on interstate commerce as part of the statutory analysis. This isn't a constitutional commerce clause analysis. This is a statutory analysis, which is incorporated into the standard requirements that are set forth in two one nine two. And because it is a used. These are used engine applies to used engines. The issue of whether the all way taxi case or the issue of its relation back to the man to the its relation back to the manufacturers does not apply. And in fact, if the if it had been ships instead of taxis, then the all way taxi all way taxi would have been decided differently. The point about all way taxi is because the statute only relates to new motor vehicles and these regulations did not relate back, that that was why the court found that those were permissible. I understood your argument to be that all way taxi was over generalizing. It was basically a local regulation as opposed to these marine vessels which purport to regulate maritime vessels that go all over the world. That's true. That's part of our argument. But I think that I think that it's really a twofold argument. One is that it is a it does. That gets to the second part of the analysis, which is that it applies to that. They are applying this rule to you. And it has a substantial effect on interstate commerce. They say it don't. That doesn't because it's just a local rule. But these ships are it first of all goes out to 24 miles, which in itself I think makes it not not not a localized rule. These engines are the auxiliary engines, right? That's true. These are the ones that run while they're still in port that power the ship while they're while they're there at the dock. Well, they all they do do that. OK. But they also. Right. I know. But just by way of preface to the question, if these rules were confined to just what happened in port, would that would that change the result? No, I don't. I don't think so, because it still would be in the still it still has an effect on the interstate commerce, which is that the ships have in order to comply, the ships have to purchase the fuel in China, Korea, Japan and all before they get to the port. In other words, this is not a this is not a regulation which which affects only their conduct within the within their effects, their conduct all the way to the port. How do you distinguish here on Portland? Well, the two things. First, I think here on Portland cement was a case that had it been decided today would have required EPA approval. That's the first point, because as the case states, there were there were questions of whether in order to comply with the smoke standards, there had to be modifications to the to the ships. And that stated right in the opinion. So first of all, that case was not a Clean Air Act case. That case was specifically a case before the Clean Air Act. And the and the and the regulation that was considered in that case had to do with the boiler standards. And the court said, well, they can still say you can't smoke here. But what what we have now is that is a Clean Air Act, which is stretches out to to the non-road engines, to the ship's engines. And I would submit that port Huron would be decided differently under the Clean Air Act and under the Boiler Act. And that's the distinction. I think it's important here. But more importantly, I think, is that is that on the. Well, not more importantly, but with respect to the second part of our argument, which is the outside three miles, of course, port Huron was restricted to when the ships were in fact alongside the dock and therefore did not reach the three mile. Let me just say briefly about the section to 11 provisions. They have nothing to do with this case either. They those fuel specification regulations preempt certain certain states, not including California, from regulating the specifications, the additives that are used in fuel that is that is sold in the market. And with respect to new motor vehicles, with respect to motor vehicles only. It's a the principal thrust of that statute is to regulate the sale, manufacture fuel within the state, which is not an issue here. But more importantly, they're arguing from a negative point of view. That is because it says nothing about fuel use and doesn't preempt fuel use requirements. That somehow means that they can regulate and adopt the emission standards. In this case, it doesn't change the analysis. The emission standard in this case is is one which is set. It sets an emission level and is therefore within the EMA versus the AQMD point. Finally, I would say that on the on the Chevron deference and the issue of the EPA's views on this. What they're trying to say is that because the because the EPA has allowed fueling misregulations, somehow this is a fuel misregulation. We don't even get to the EPA and Chevron deference in this case because the EPA has not, in fact, said anything about this kind of regulation and whether or not it is a use or fuel use standard. Unless the court has further questions. Mr. Stern, I think you reserve two minutes to make sure you have two minutes on the clock. As I said, we can't we can't see on the very last point on the very last point that Mr. Weiss made, EPA has commented about state fuel regulations one time in its response to comments when it issued its nineteen ninety nine regulations for ocean going vessels. It actually said to in its response, and this is cited in the brief, that states are in a position to regulate the fuel used by ocean going vessels. More recently, twice in 2007 in its regulations. And again, I've cited to these in the brief. They have cited with approval California's actions generally with regard to reducing pollutions at ports and in and around the port areas. As part of that plan that they cite to, the VESS rules are in that plan. I'd also like to mention that it is actually undisputed in this case that the vessels and the same vessels and the same engines can be used to comply with the VESS rules. No modifications, no retrofits, no design change. How do you respond to Mr. Weiss's argument that that's not necessarily so with regard to piping fuel lines and so on, that that's considered part of a non-motor vehicle engine? I respond that the evidence in the record is contrary to that. The only evidence there is in the record is that in response to CARB surveys, some vessel owners have responded that they needed to make changes to the piping, that sort of thing. That's a far cry from saying that those were actually required or that those are not just minimus changes. Those may just be maintenance, but in the record in this case, it is undisputed, PMSA admitted, that no changes need to be made. In the engine itself? In the engine, which PMSA claims to include the piping and fuel pumps and that sort of thing. It looks like your time is up. Thank you very much. Ms. Baird, thank you. Mr. Weiss, thank you as well. The case just argued is submitted. We're going to stand in recess. Ladies and gentlemen, if you'd like, I think the law clerks are going to be hanging around if you want to chat with them. After we go back and finish our conference, we'll be out to chat with you if you'd like as well. Thank you. Stand in recess.
judges: Silverman, McKeown, Tallman